## APPEAL OF MAHONING COAL RAILROAD COMPANY.

Docket No. 2202.     Decided September 22, 1926.

Upon all the evidence, *held*, that the petitioner was affiliated with the New York Central R. R. Co. during the years 1918, 1919, and 1920.

*Charles C. Paulding, Esq.*, and *Wm. Mann, Esq.*, for the petitioner.
*P. S. Crewe, Esq.*, for the Commissioner.

This appeal is from the determination by the Commissioner of a deficiency of $385,256.28 income and excess-profits tax for the years 1919 and 1920.

The deficiency arose by reason of the following rulings of the Commissioner, which are assigned as errors by the taxpayer:

(1) The refusal of the Commissioner to regard the taxpayer as affiliated with the New York Central R. R. Co., and to permit a consolidated return by the two companies.

(2) The determination by the Commissioner that income and excess-profits taxes imposed upon the taxpayer for the years 1919 and 1920, and paid by taxpayer's lessee, the New York Central R. R. Co., in 1920 and 1921, respectively, constituted additional income to the taxpayer for the years 1919 and 1920.

(3) The determination by the Commissioner that the additional taxes sought to be assessed against the taxpayer for the years 1919 and 1920, and to be paid by said lessee, constitute additional taxable income for said years.

### FINDINGS OF FACT.

On July 1, 1884, the Mahoning Coal R. R. Co. leased its properties of every nature to the Lake Shore and Michigan Southern Ry. Co., in perpetuity, subject to certain conditions subsequent, and as rentals for said properties, the lessee contracted to pay to lessor, *inter alia,*

" all taxes and assessments which may be levied or become chargeable on the said road or property, or upon the said Mahoning Company, by reason of its ownership thereof."

In 1914, the New York Central R. R. Co. succeeded to the rights of the Lake Shore Company, under that lease contract.

The Mahoning Company at all times since 1884 has preserved its corporate existence and organization with its president and board of directors, and its board of directors have held annual meetings. It has not maintained an operating organization nor does it in any way operate its properties, such functions being entirely under the control and management of its present lessee, the New York Central R. R. Co.

The stock of the Mahoning Company held by the New York Central R. R. Co., and by stockholders of the New York Central, during the years 1919 and 1920, was as listed below, and during that time there were outstanding 43,227 shares of said stock, consisting of 30,000 shares of common stock and 13,227 shares of preferred stock, both common and preferred stock possessing voting rights.

| Name of stockholder | Mahoning Coal R. R. Co. shares | N. Y. Central shares |
|---|---:|---:|
| Marion B. Elliott | 87 | 4 |
| Farmers Loan & Trust Co., trustee u/w N. C. Scoville | 14 | 471 |
| Emma D. Freeman | 200 | 154 |
| Robert Walton Goelet | 550 | 100 |
| George B. Grinnell | 74 | 200 |
| Edward S. Harkness | 375 | 18,000 |
| Anna M. Harkness | 500 | 18,000 |
| Elizabeth C. Heartt | 75 | 84 |
| Emily Hoyt | 68 | 47 |
| Mary F. Hoyt | 68 | 47 |
| Ellen D. Hunt | 100 | 837 |
| Jackson & Curtis | 150 | 30 |
| Frank J. Jerome | 2 | 31 |
| A. M. Kidder & Co | 10 | 586 |
| Cornelia E. McDonald | 227 | 300 |
| Providence Mutual Fire Insurance Co | 200 | 250 |
| Mary J. Riker | 100 | 220 |
| Samuel Riker, jr | 37 | 250 |
| Charles F. Roe | 350 | 250 |
| Grace Scoville | 34 | 263 |
| Herbert Scoville | 61 | 100 |
| Lois C. Scoville | 33 | 90 |
| Robert Scoville | 47 | 125 |
| Edith Scoville | 33 | 90 |
| Mary Frances Scoville | 34 | 90 |
| Mary E. Schell | 227 | 363 |
| John Steward, jr | 125 | 232 |
| William K. Vanderbilt | 1,200 | 119,300 |
| William K. Vanderbilt, jr | 2 | 10,000 |
| Elizabeth R. Van Dyck | 100 | 294 |
| Mary L. Willard | 138 | 21 |
| C. B. Woodruff et al., trustees | 373 | 1,03 |
| Emily V. White | 1,500 | 5,500 |
| Total | 7,094 | 177,36 |
| Mahoning Coal R. R. stock held by New York Central | 25,308 | |
| Total number of shares | 32,402 | |

A summary of holdings of Mahoning Coal R. R. Co. stock for the years 1916 to 1920, inclusive, follows:

| Year | Held by stockholders of N. Y. Central | Held by New York Central | Percentage of stock held by N. Y. C. R. R. and its stockholders |
|------|------|------|------|
| 1916 | 8,790 | 25,288 | 78.9 |
| 1917 | 9,439 | 25,288 | 80.4 |
| 1918 | 8,387 | 25,288 | 77.8 |
| 1919 | 7,094 | 25,308 | 74.9 |
| 1920 | 7,094 | 25,308 | 74.9 |

At the annual meeting of the stockholders of the taxpayer company held May 2, 1917, there were voted 35,267 shares of stock of the taxpayer company, of which number Alfred H. Smith and Dwight W. Pardee, president and secretary, respectively, of the New York Central R. R. Co., held proxies representing 35,245 shares of stock, executed by the holders of said shares of stock authorizing said Alfred H. Smith and Dwight W. Pardee, or either of them, to represent said stockholders at said meeting, or any adjournment or postponement thereof, and to vote in the name, place and stead of said stockholders for the election of directors of said taxpayer company or upon any matter or question presented at said meeting, with full power of substitution to them or either of them. Twelve shares of stock were voted by S. H. West, an attorney for the New York Central R. R. Co., in person. Said 35,245 shares of stock were voted by Dwight W. Pardee pursuant to said proxies.

Of the seven directors of the taxpayer company elected May 2, 1917, whose terms of office expired May 1, 1918, two were directors, one president, one a vice president, one an attorney, and two were other officials of the New York Central R. R. Co. During that year all of the five members of the executive committee of the taxpayer company were officers or directors of the New York Central R. R. Co. The president, vice president, secretary and treasurer of the taxpayer company were president, vice president, secretary and treasurer, respectively, of the New York Central R. R. Co., and all other officers of the taxpayer company were officers of the New York Central R. R. Co.

At the annual meeting of stockholders of the taxpayer company, held on May 1, 1918, the number of shares of stock voted was 35,301. Proxies were executed by stockholders owning 35,297 shares to Alfred H. Smith, formerly president of the New York Central R. R. Co., and at that time acting as Regional Director of the United States Railroad Administration, and Dwight W. Pardee, secretary of the New York Central R. R. Co., or either of them, to represent said stockholders at said meeting, or any adjournment or postponement thereof, and to vote in the name, place and stead

of said stockholders for the election of directors of said taxpayer company or upon any matter or question presented at said meeting, with full power of substitution to them or either of them. Said 35,297 shares of stock were voted by Dwight W. Pardee pursuant to said proxies. The balance of stock, namely, four shares, voted at said meeting was voted by F. J. Jerome, a director of the New York Central R. R. Co.

During the year 1918 one of the directors of the taxpayer company was president, one a vice president, and two were directors of the New York Central R. R. Co. Of the two members of the executive committee of the taxpayer company one was president and the other a director of the New York Central R. R. Co. During said year the president, secretary and treasurer of the taxpayer company were president, secretary and treasurer, respectively, of the New York Central R. R. Co., and all the other officers of the taxpayer company were officers of the New York Central R. R. Co.

A special meeting of the stockholders of the taxpayer company was held on September 27, 1918, for the purpose of considering a preamble and resolution adopted by the board of directors of the taxpayer company at a meeting held on August 27, 1918, fixing the amount of compensation to be received annually by the taxpayer company for the use and possession of its railroad during the period of Federal control, and the joining by the taxpayer company in the execution of the contract made by the New York Central R. R. Co. with the United States of America for the use of its property during the period of Federal control and approving a revision of the by-laws of taxpayer. At said meeting stockholders owning 34,324 shares of stock of the taxpayer company executed proxies authorizing William K. Vanderbilt, Jr., president, Dwight W. Pardee, secretary, and Frank J. Jerome, a director, of the New York Central R. R. Co., or any of them, to represent said stockholders at said meeting, and to vote in the name, place and stead of said stockholders upon any matter or question presented at said meeting with full power of substitution. Said 34,324 shares of stock were voted by Frank J. Jerome, pursuant to said proxies. The total number of shares of stock represented and voting at said meeting by proxy or in person was 35,464.

On December 31, 1918, the New York Central R. R. Co. owned 25,288 shares of stock, common and preferred, of the taxpayer company, and stockholders of the New York Central R. R. Co. owned 8,387 shares of stock of the taxpayer company, making a total of 33,675 shares of stock of the taxpayer company owned by the New York Central R. R. Co. and stockholders of said company, or 77.8 per cent of the total number of shares of stock of the taxpayer company issued and outstanding on said date.

At the annual meeting of the stockholders of the taxpayer company held on May 7, 1919, the total number of shares of stock voted was 33,932. Stockholders of said company owning 33,192 shares of stock executed proxies authorizing William K. Vanderbilt, Jr., a director and chairman of the finance committee of the New York Central R. R. Co., and president of said company during part of the year 1919, Albert H. Harris, vice president, and Dwight W. Pardee, secretary, or any one of them, to represent said stockholders at said meeting, or any adjournment or postponement thereof, and to vote in the name, place and stead of said stockholders upon any matter or question which might be presented at said meeting, with full power of substitution, and said 33,192 shares of stock were voted by Frank J. Jerome, a director of the New York Central R. R. Co., under power of substitution contained in said proxies.

During the year 1919, of the seven directors of the taxpayer company, two were directors, one was president and one a vice president of the New York Central R. R. Co. The president, vice president, secretary, treasurer, comptroller, and chief engineer of the taxpayer company were president, vice president, secretary, treasurer, comptroller, and chief engineer, respectively, of the New York Central R. R. Co., and all other officers of the taxpayer company were officers of the New York Central R. R. Co.

On December 31, 1919, the New York Central R. R. Co. owned 25,308 shares of stock, common and preferred, of the taxpayer company, and stockholders of said company owned 7,094 shares of stock of the taxpayer company, making the total number of shares of stock of the taxpayer company held by the New York Central R. R. Co. and stockholders of said company 32,402, being 74.95 per cent of the total number of shares of stock of the taxpayer company issued and outstanding on said date.

At the annual meeting of stockholders of the taxpayer company held on May 5, 1920, 32,923 shares of stock were voted. Three hundred and forty-two shares were voted in person and stockholders holding 32,581 shares executed proxies to Alfred H. Smith, president, Albert H. Harris, vice president, and Edward F. Stephenson, secretary, of the New York Central R. R. Co., authorizing them, or any one of them, to represent said stockholders at said meeting, or any adjournment or postponement thereof, and to vote in the name, place and stead of said stockholders for the election of directors of said company, and upon any other matter or question presented at said meeting, with full power of substitution, and said 32,581 shares of stock were voted by Edward F. Stephenson pursuant to said proxies.

During the year 1920, of the seven directors of the taxpayer company two were directors of the New York Central R. R. Co., one

was president, and one a vice president of the New York Central R. R. Co. The president, vice president, secretary, treasurer and comptroller of the taxpayer company were, respectively, president, vice president, secretary, treasurer and comptroller of the New York Central R. R. Co., and all the other officers of the taxpayer company were officers of the New York Central R. R Co.

During the year 1920, the New York Central R. R. Co. owned 32,403 shares of stock, common and preferred, of the taxpayer company, and stockholders of said company owned 7,094 shares of stock of the taxpayer company, making the total number of shares of stock of the taxpayer company held by the New York Central R. R. Co. and stockholders of said company 32,402, being 74.95 per cent of the total number of shares of stock of the taxpayer company issued and outstanding on said date.

No meetings of the stockholders of the taxpayer company were held during the years 1917 to 1920, inclusive, except those above mentioned.

A list of stockholders of the Mahoning Company who held no stock of the New York Central shows that said stock was held by aproximately 160 persons, said holdings ranging in size from 1 share to 1,500 shares, by far the greater number being below 200 shares, and the owners being located in a number of cities in a number of States.

At none of said annual meetings did any of the stockholders other than those above accounted for take part.

The New York Central R. R. Co. paid the income and profits taxes due by the taxpayer for the year 1919, and first quarter of the year 1920, on the basis of returns made for those years.

The lease under which the road of the taxpayer was operated by the New York Central during 1919 and 1920, except during the period of Federal control, provides:

(a) That the taxpayer will make any and all other or further conveyances or contracts which may be necessary to protect the Lake Shore Company in its operation of the road and property or in the enjoyment and exercise of its rights.

(b) That if at any time the Lake Shore Company shall consider it necessary to lay a second track or extend the main track of the road of the Mahoning Company or construct branches or make any substantial improvements, the parties shall, by mutual agreement, subject to the approval of two-thirds of the stockholders of the Mahoning Company, decide as to the necessity of such improvement and as to the method of providing for the payment therefor, and in case of disagreement arbitrators are to be chosen. ·

(c) That the Lake Shore Company will at all times keep full, true and accurate accounts of all traffic carried or business done over

taxpayer's road and of the gross earnings derived from such operations, which shall be open to inspection by the taxpayer; that it will render semiannually a full and correct account of the earnings and will at the time of rendering such account pay to the Mahoning Company 40 per cent of the gross earnings of the road; "that such Mahoning Company's said 40 per cent shall be sufficient every six months to pay the current half year's interest per annum on said Mahoning Company's issue of $1,500,000 of bonds and upon any bonds that may be issued at request of said Lake Shore Company to provide for the retirement of said issue or any subsequent issue of bonds, at maturity, and the current half year's dividend of 2½ per cent upon any preferred stock of said company, not, however, to exceed $400,000 in amount, issued and outstanding; and also the cost not to exceed $1,000 per annum of maintaining the corporate organization of said Mahoning Company; and in case said earnings are at any time insufficient in that behalf, it, the said Lake Shore Company, will advance the money needed to make good the deficiency; provided, however, that in case it shall at any time be required to make and shall make any advance of money, the money so advanced shall remain a charge upon any future earnings to which said Mahoning Company shall become entitled over and above the amount required to pay such interest and dividends and cost of maintaining the organization of said company."

By supplemental agreement of October 12, 1918, the taxpayer and New York Central R. R. Co. agreed that the annual compensation of the taxpayer during the period of Federal control should be $1,309,845.67; this sum being payable in addition to the liability of the New York Central to pay taxes and assessments under the clause quoted in the findings of fact above.

The interest on the debt and dividends on the preferred stock amounted during the years in question to approximately $108,000. The income under the lease was, for 1918, $1,309,845.67, for 1919, $1,309,845.67, and for 1920, $2,329,473.21.

The road of the taxpayer runs north from Youngstown, Ohio, to Andover and Mann, both in Ohio, in two branches. At each of these terminals it joins the road of the Lake Shore and Michigan Southern Ry., operated by the New York Central. This connection of the Lake Shore runs to Ashtabula, Ohio, on Lake Erie, where it makes connections with the main line of the New York Central R. R. The lines from Youngstown to Ashtabula are operated by the New York Central as the Franklin division, the operation being without respect to the fact that the trains operate over the roads of two independent companies, except as it is necessary under the terms of the lease to apportion the revenue received from the operation on the basis of mileage and tonnage.

OPINION.

LOVE: The exact nature of the decision in this appeal depends on the decision

(1) Whether or not the New York Central R. R. Co. and the Mahoning Company, in 1919 and 1920, were affiliated corporations; and if not, then

(2) Whether or not the income and excess-profits tax due by the taxpayer corporation for those years and paid by its lessee under the lease contract constituted taxable income to the taxpayer.

The Revenue Act of 1918, in dealing with corporation income and profits taxes, in paragraph (b) of section 240, prescribes:

For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.

The part of paragraph (a) of section 240, pertinent to the question here involved, prescribes:

That corporations which are affiliated within the meaning of this section shall, under regulations to be prescribed by the Commissioner with the approval of the Secretary, make a consolidated return of net income and invested capital * * *.

This Board has not, and no appellate court has, prescribed an exact percentage of stock necessary to be held or controlled to constitute affiliation. In the very nature of the subject, the problem must be solved in the light of the actual facts as they exist in each case, always bearing in mind that actual control of substantially all the voting stock is essential and that such control does not, necessarily, depend upon ownership.

In the *Appeal of Canyon Lumber Co.*, 1 B. T. A. 473, and *Appeal of Isse Koch & Co.*, 1 B. T. A. 624, this Board held that the control "referred to in the statute, whether it be legal or otherwise, means control of the voting rights of stock." This Board further held in the last cited appeal that "The object sought to be accomplished by Congress, in enacting section 240 of the Revenue Act of 1918, was to tax as a business unit what really was a business unit." See, also, *Appeal of Hagerstown Shoe & Legging Co.*, 1 B. T. A. 666; *Appeal of Hamilton & Chambers Co.*, 1 B. T. A. 694; and *Appeal of Rowe Transfer & Coal Co.*, 1 B. T. A. 593.

It will be noted that during the taxable years the New York Central owned in its own right more than 58 per cent of the stock of the Mahoning Company; that the New York Central and its officers and stockholders owned from 74 to 80 per cent of said stock;

that the officers of the New York Central were also officers of the taxpayer corporation, and that at all annual stockholders' meetings the officers of the New York Central voted by right of proxy, or otherwise, more than 81 per cent of the stock of the taxpayer corporation, same being practically all the stock that participated in said meetings, and there was no opposing vote to the policies adopted.

It will be further noted that the stock of the Mahoning Coal R. R. Co. held by persons who held no stock in the New York Central, was held by a comparatively large number of persons in small amounts, the owners being scattered over a large territory, evidencing the fact, which is corroborated by the facts established, that there was no organized group of minority stockholders, and that their failure to take part in annual meetings resulted from a feeling of satisfaction with the management, and a predetermination to acquiesce in the policies adopted rather than from an unfriendly or antagonistic attitude toward such management.

In the *Appeal of Hartford & Connecticut Western R. R. Co.*, 2 B. T. A. 211, where the taxpayer claimed affiliation with the New Haven R. R. Co., this Board said:

The contract is not a mere lease by which a lessor lets its property to a lessee for a rental. It is a virtual relinquishment by the taxpayer to the New Haven of its rights and powers as a subsisting business institution and places the New Haven in control of its destiny. Not only does the New Haven possess and operate the properties, it also may require the taxpayer to acquire more property and to mortgage them as the New Haven directs. All of the taxpayer's railroad business is out of its hands, including its operating income; and whatever franchises it acquired have been placed at the New Haven's disposal. That under these circumstances the New Haven actually controls the business and properties of the taxpayer is plain to be seen.

But it is said that this alone is not enough to bring the statute into operation, because the control of the business and properties is not the control of substantially all the stock. And it is true that in many cases the two are distinct. It does not follow from a lease of the entire properties of a corporation that the lessee can be said to control the stock. *Appeal of Old Colony R. R. Co.*, 1 B. T. A. 1067. There must be substantially more. Certainly there must be a common interest above that of the ordinary lessor in his rent and the preservation of his property. In the present case, however, it is contended that the existence of a substantial minority of outstanding stock should defeat affiliation. It is not shown that by any act such minority has or could frustrate any purpose or plan of the New Haven, but, on the contrary, the insignificant number of minority shares which voted at the stockholders' meetings in 1917 and 1918 indicates an unobstructed control by the New Haven. Whatever the New Haven requested was done. And how could it be otherwise? The New Haven had the property and it also held sufficient votes to overcome any opposition to its management. Although theoretically the lessor had the right to enforce the terms of the lease and demand forfeiture or other remedy in default of any of the covenants, how was this to be accomplished if the New Haven resisted? Its officers controlled the properties and management, both as officers and directors of the taxpayer, and its majority of shares was

behind these directors. The sum total of the affairs of the taxpayer was therefore in the hands of the New Haven.

All that the shares of stock represented to the minority holders was the right to receive dividends on their stock. And it may be questioned how that right was to be preserved in the event of financial failure of the New Haven. Even a minority stockholders' proceeding would hardly be adequate where the effectiveness of the business depends on its relation to the larger transportation system of which it is a part. When one corporation so far controls the property and affairs of the other as to leave in the minority stockholders nothing but a bare interest in a division of the rental, it is quibbling to say that the minority stock is not controlled. We must conclude that the New Haven owned directly or controlled substantially all the stock of the taxpayer, and that they were affiliated within the meaning of the statute.

Under such conditions we reach the conclusion that the two companies were affiliated.

The counsel for the Commissioner cites the *Appeal of Old Colony R. R. Co.*, 1 B. T. A. 1067, and urges that it is controlling in this appeal. Control by one corporation of the business operations of another corporation, while a significant circumstance in determining the main question, i. e., control of the stock, is not sufficient within itself to bring the companies within the statutory definition of affiliation. If control of business operations were a dominating factor in this question the decision in the *Appeal of Old Colony R. R. Co.* would likely have been different. In that case the dominant company held a 99-year lease, the terms of which gave it almost absolute control of all business activities of the other company, but it controlled only 44 per cent of the stock of that other company, and there was no evidence tending to show that it controlled or influenced the voting rights of the other outstanding 56 per cent of stock.

This Board has not held, and the statute does not prescribe, that ownership by one corporation of practically all the stock of another is the only ground for affiliation. The statute prescribes and it is sufficient if " substantially all of the stock " (that is, voting rights) " of two or more corporations is owned or controlled by the same *interests.*" As stated in the *Appeal of Isse Koch & Co., supra*, each case must be considered and decided on its own facts and surrounding circumstances. Control need not be legal control, but community of interest may, if recognized and acted upon, constitute sufficient basis to determine the question of control.

In the *Old Colony R. R. Co.* case it was not shown that more than 44 per cent of the stock of one corporation was in any way controlled by the other corporation as a corporate entity, or by its stockholders. There was no concert of action or harmony of interests as between the holders of the 44 per cent and the 56 per cent of stockholders. The conditions are materially different in the instant appeal. Here we have present all the circumstances relative to busi-

ness control that were urged in the *Old Colony R. R. Co.* appeal, and further, we have one company and its officers and stockholders actually voting no less than 81 per cent of the stock of the subsidiary company regularly, through a long period of years, with no opposition votes at any time. Clearly the two companies acted as a business unit, prompted by a potent common interest.

If the statute means that affiliation results from a condition of stock ownership and control, such as enables one person, or one group of persons, to control practically all the voting stock, whether that control arises from actual ownership, or such community of interest as to place practically all of the voting stock subject to disposal in stockholders' meetings by that single dominating unit, we believe the conditions contemplated by the statute have been met.

In view of the fact that it was conceded on the hearing before the Board that in the event of a decision by this Board that a consolidated return is proper, then the second and third assignments of error necessarily become moot questions, no decision is here made on those questions.

> *Judgment will be entered on 15 days' notice, under Rule 50.*

LITTLETON, MORRIS, and PHILLIPS dissent.